# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00453-CV

---

**Volkswagen Aktiengesellschaft, Appellant**

**v.**

**The State of Texas and Travis County, Texas, Appellees**

---

### NO. 03-20-00022-CV

---

**Audi Aktiengesellschaft, Appellant**

**v.**

**The State of Texas and Travis County, Texas, Appellees**

---

**FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-GN-16-000370, THE HONORABLE TIM SULAK, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

Volkswagen Aktiengesellschaft (VW Germany) and its subsidiary Audi Aktiengesellschaft (Audi Germany) are car manufacturers headquartered in Germany that installed "defeat device" software in diesel cars to evade compliance with the United States' federally mandated emissions standards and subsequently updated that software to resolve hardware failures being caused by the defeat devices. When the fraud was revealed, VW

Germany and its subsidiaries, including Audi Germany, Porsche Aktiengesellschaft, Volkswagen Group of America, Inc. (VW America), Volkswagen Group of America Chattanooga Operations, LLC, Audi of America, LLC (Audi America), and Porsche Cars North America, Inc. (Porsche America), (collectively, VW entities) became the target of a federal criminal case, multiple federal and state civil-enforcement actions, and numerous private lawsuits. The VW entities settled the EPA's criminal and civil actions for over $20 billion but did not obtain a release of liability from state and local governments. This appeal arises from the State of Texas's civil-enforcement action against VW Germany, VW America, Audi Germany, Audi America, and Porsche America for violations of the Texas Clean Air Act stemming from the installation of the defeat-device software and the subsequent updates to that software on cars in Texas.[1] *See* Tex. Health & Safety Code §§ 382.001–.510. In these interlocutory appeals, which we have consolidated for consideration, VW Germany and Audi Germany appeal from the trial court's orders denying their special appearances, and the sole issue is whether a Texas court may, consistent with due process, exercise specific jurisdiction over these foreign corporations under the facts of this case. Because VW Germany and Audi Germany did not purposefully avail themselves of the privilege of conducting activities in Texas, we reverse the trial court's orders and render judgment dismissing the claims against VW Germany and Audi Germany.

---

[1] Multiple Texas counties intervened in the State's suit and others filed their own Texas Clean Air Act enforcement actions. All the Texas Clean Air Act enforcement cases, including the State's, were consolidated into a pre-trial MDL proceeding in Travis County district court. *See In re Volkswagen Clean Diesel Litig.*, 557 S.W.3d 78, 81 (Tex. App.—Austin 2017, orig. proceeding). For simplicity, we use "trial court" to refer to the pre-trial MDL court.

## Background[2]

In 2006, after concluding that some of their diesel-engine cars would not meet newly established U.S. emissions standards while still operating at a performance level appealing to customers, VW Germany and Audi Germany developed defeat-device software that enabled their cars to pass the U.S. emissions tests, even though those cars could not actually meet the emissions standards while being driven. *See* 42 U.S.C. §§ 7521, 7525 (Clean Air Act (CAA) provisions requiring that new motor vehicles comply with federal emissions standards); *see also id.* §§ 7521(a)(4)(A), 7522(a)(3)(B) (prohibiting defeat devices).[3]

Between 2009 and 2015, VW Germany and Audi Germany installed the defeat-device software in more than 500,000 new vehicles that were manufactured in Germany and sold in the United States, including in Texas (affected vehicles). VW America, which has the exclusive right to import, distribute, market, advertise, and sell Volkswagen and Audi vehicles in the United States, purchased the affected vehicles in Germany and then sold the cars to its independent authorized franchise dealerships throughout the United States, including in Texas.[4] Those dealerships sold the affected vehicles to consumers throughout the United States, including in Texas.

In 2012, vehicles equipped with the defeat-device software developed hardware failures. Suspecting that the failures were caused by the defeat-device software, VW Germany

---

[2] We take the background facts, which are undisputed, from the parties' briefs and from *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*, 959 F.3d 1201, 1205 (9th Cir. 2020) (relying on the facts stipulated to by VW Germany in its plea agreement with the federal government in *United States v. Volkswagen AG*, No. 16-cr-20394-SFC-APP-8, Dkt. 68 (E.D. Mich. Mar. 10, 2017)).

[3] For a detailed explanation of the defeat devices and subsequent updates see *In re Volkswagen*, 959 F.3d at 1206–08.

[4] VW America sells the Audi-branded vehicles through its subsidiary Audi America.

developed new software to correct the problem. Audi Germany did not participate in the development of the updated "tampering" software, but it did test the new software for compatibility with Audi vehicles. VW Germany and Audi Germany provided the updated software to VW America by uploading it to their servers in Germany, which were synchronized with VW America's server in the United States. From VW America's server, the software automatically downloaded to a platform used by Volkswagen and Audi dealerships worldwide, allowing technicians to install the software in affected vehicles. VW Germany and Audi Germany directed VW America to install the new software through a series of voluntary recalls and software fixes. The software was also updated when customers brought their affected vehicles in for normal maintenance. The actual purpose of the software updates was not disclosed.

After an independent study revealed that certain Volkswagen vehicles emitted air pollutants well beyond permissible limits, the EPA began an investigation, and in August 2015, a Volkswagen whistleblower informed federal regulators about the defeat devices. Soon thereafter, VW Germany disclosed the entire tampering scheme to federal regulators. The EPA subsequently filed a criminal action against VW Germany, which ultimately pleaded guilty and agreed to pay a $2.8-billion criminal fine to the United States. The EPA also filed a civil-enforcement action against the VW entities, alleging that they had violated the CAA by equipping vehicles sold nationwide with federally prohibited defeat devices and by later installing software updates to the defeat devices in new and existing vehicles. The civil action was resolved through consent decrees that covered all civil claims for relief under the CAA for any conduct described in the EPA's complaints against the VW entities. The consent decrees imposed on the VW entities various injunctive remedies and multi-billion-dollar monetary

4

penalties, including $209 million specifically allocated to the State of Texas for environmental remediation, $1.45 billion in relief for Texas consumers, and more than $92 million to compensate Texas dealers. According to VW Germany, Texas and its residents stand to recover more than $1.35 billion from the federal actions.

Several states, local governments, and consumer groups also brought lawsuits against the VW entities in both state and federal courts in connection with the use of the defeat devices and related software updates. This appeal arises from the State of Texas's state-court suit against VW Germany, VW America, Audi Germany, Audi America, and Porsche America for violations of the Texas Clean Air Act.

The State's original petition, which named only VW America and Audi America as defendants, asserted that the factory installation of defeat devices on affected vehicles in Texas violated the Texas Clean Air Act. *See* Tex. Health & Safety Code § 382.085(b) (prohibiting violations of Texas Clean Air Act and TCEQ rules); Tex. Water Code § 7.101 (prohibiting violation of statute or TCEQ regulation); 30 Tex. Admin. Code §§ 101.3 (TCEQ, Circumvention), 114.20 (TCEQ, Maintenance and Operation of Air Pollution Control Systems or Devices Used to Control Emissions from Motor Vehicles). These allegations are referred to as "original tampering" claims because they are based on the installation of the defeat-device software in the affected vehicles before their sale to consumers.

In August 2017, the judge overseeing the federal multi-district litigation of the Volkswagen diesel-emissions scheme held that federal law preempted the original-tampering claims brought by the state of Wyoming. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 264 F. Supp. 3d 1040, 1045, 1057 (N.D. Cal. Aug. 31, 2017). In response, the State amended its pleadings in the underlying case to add "recall tampering"

5

claims—i.e., allegations that after the affected vehicles had been sold to consumers, the VW entities tampered with those vehicles through software updates to the defeat devices that were installed at dealerships as part of nationwide recall campaigns or when cars were brought in for servicing. *See* Tex. Water Code § 7.101; Tex. Health & Safety Code § 382.085(b); 30 Tex. Admin. Code § 114.20(b), (e). The State also added Porsche America as a defendant. VW America, Audi America, and Porsche America moved for summary judgment, asserting, among other matters, that the federal CAA preempted the State's claims against them, *see* 42 U.S.C. § 7543 (preempting state and local laws regulating emissions from new motor vehicles), and that the vehicle-manufacturing conduct at issue in the case was not subject to the Texas Clean Air Act and related regulations asserted by Texas. The trial court granted summary judgment on the original-tampering claims, but denied summary judgment on the recall-tampering claims.

During this time, the State added VW Germany and Audi Germany to its suit. VW Germany and Audi Germany filed special appearances after the trial court rendered summary judgment against the State on its original-tampering claims. Both argued that they were not subject to personal jurisdiction in this proceeding because they did not have the required minimum contacts with Texas. After a year of jurisdictional discovery and a hearing on the issue, the trial court denied the special appearances. Both VW Germany and Audi Germany appealed from the trial court's interlocutory ruling, *see* Tex. Civ. Prac. & Rem. Code § 51.014(a)(7) (authorizing appeal from interlocutory order granting or denying special appearance under Tex. R. Civ. P. 120a), and we have consolidated the appeals for consideration. At issue is whether the trial court erred in concluding that it had personal jurisdiction over VW Germany and Audi Germany and in denying their special appearances.

6

## Personal Jurisdiction

Texas courts have personal jurisdiction over a nonresident defendant when the Texas long-arm statute provides for it and the exercise of jurisdiction is consistent with federal and state due-process guarantees. *See Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)). Due-process requirements are satisfied if the nonresident defendant: (1) has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Moncrief Oil*, 414 S.W.3d at 150).

A defendant's minimum contacts with the forum may give rise to either general or specific jurisdiction. General jurisdiction is established when the defendant's contacts "are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'' *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Old Republic*, 549 S.W.3d at 559 (citing *Moncrief*, 414 S.W.3d at 151). "It involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *PHC–Minden, LP v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007). Here, we are concerned only with whether the nonresident defendant's alleged minimum contacts gave rise to specific jurisdiction, which is triggered when the plaintiff's cause of action arises from or relates to those contacts. *Old Republic*, 549 S.W.3d at 559 (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 795 (Tex. 2005)); *see Moki Mac*, 221 S.W.3d at 575–76 (explaining that a specific-jurisdiction analysis requires review of the "relationship among the defendant, the forum[,] and the litigation" (alteration in original) (citation omitted)).

7

Specific jurisdiction must be established on a claim-by-claim basis unless all the asserted claims arise from the same forum contacts. *Moncrief*, 414 S.W.3d at 150–51.

A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (citations omitted). "Purposeful availment involves contacts that the defendant 'purposefully directed' into the forum state." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016) (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)); *see J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 885–86 (2011) (plurality opinion) (holding that New Jersey lacked jurisdiction over foreign defendant because that defendant had not "engaged in conduct purposefully directed at New Jersey"); *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987) (plurality opinion) ("The 'substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*."); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 38 (Tex. 2016) ("To constitute purposeful availment, the defendant's contacts must be 'purposefully directed' to the state"); *Moki Mac*, 221 S.W.3d at 569 (noting that due process requires that a non-resident defendant "must take action that is purposefully directed toward the forum state . . . and must result from the defendant's own 'efforts to avail itself of the forum'"). Three principles guide the purposeful-availment analysis: (1) "only the defendant's contacts with the forum" are relevant—not the unilateral activity of another party or third person; (2) the defendant's acts must be "purposeful" and not "random, isolated, or fortuitous"; and (3) the defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" such that it impliedly

8

consents to suit there. *Michiana*, 168 S.W.3d at 785 (citations omitted). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Retamco*, 278 S.W.3d at 338 (citation omitted).

Texas law presumes that separate corporations are distinct entities. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002). Because of this presumption of corporate separateness, a parent company is not subject to jurisdiction in a state simply because the subsidiary is carrying on business in the forum state. *PHC-Minden*, 235 S.W.3d at 172. Instead, each defendant's contacts with the forum state must be assessed individually. *Id.*[5]

### Analysis

The principal question we must address in this appeal is whether VW Germany's and Audi Germany's recall-tampering activities satisfy the purposeful-availment requirement for personal jurisdiction. More specifically, we must determine whether VW Germany and Audi Germany purposefully directed recall-tampering activity toward Texas and, thus, necessarily invoked the benefits and protections of its laws and is subject to Texas's jurisdiction for claims arising from those activities. *See Searcy*, 496 S.W.3d at 66–67.

**VW Germany's Contacts**

The State contends that VW Germany purposefully availed itself of the benefit of conducting activities in Texas when it:

---

[5] There are exceptions to recognizing the corporate form in personal-jurisdiction analysis, including veil piercing or alter ego, *see, e.g.*, *PHC–Minden, LP v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007), but the State specifically disavows reliance on such theories in this case.

- directed VW America to install on vehicles in the United States, including vehicles in Texas, the tampering software that VW Germany alone had developed—VW Germany knew that there were affected cars in Texas when it ordered VW America to install the tampering software through informal and formal recall campaigns;

- electronically distributed the new tampering software for installation onto vehicles in the United States, including vehicles in Texas, at the push of a button—VW Germany uploaded tampering software to its server in Germany, that software automatically synchronized onto a server in the US, and that software automatically downloaded onto the service platform used by VW America technicians in the United States, including Texas;

- provided the technical description of the recall—i.e., the false information regarding the reason for the recall—that VW America used in letters sent to technicians and customers in the United States, including Texas, and sent VW America a list of the vehicles in the United States affected by the recalls, including vehicles in Texas;[6] and

- reimbursed VW America, which reimbursed dealers in the United States, including dealers in Texas, for the cost to install the new tampering software in each vehicle in the United States, including vehicles in Texas.

We disagree that this conduct constitutes purposeful availment.

Purposeful availment requires contacts that the defendant "purposefully directed *toward the forum state*." *Nicastro*, 564 U.S. at 886 (emphasis added); *see Searcy*, 496 S.W.3d at 67 ("Purposeful availment involves contacts that the defendant 'purposefully directed' into the forum state."); *TV Azteca*, 490 S.W.3d at 38 (same). VW Germany's recall-tampering activities were not purposefully directed at Texas. VW Germany developed the tampering software in Germany; it directed VW America to install the tampering software on vehicles in the United States; it provided the technical description of the recall to VW America; it uploaded the

---

[6] The State asserts that, in addition to providing the technical information, VW Germany drafted the documents about the recall campaign that were sent to dealers and customers in the United States, including Texas. However, the evidence the State cites to and relies on in support of this contention establishes that VW America, not VW Germany, drafted the recall documents that went to dealers and customers. As such, we do not consider this action. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) ("[I]t is only the defendant's contacts with the forum that count.").

software to its server in Germany; and it reimbursed VW America on a nationwide basis for the costs of implementing the recall. The State does not allege any facts or present any evidence that VW Germany maintained any offices, plants, or other facilities in Texas; sent any of its employees to Texas for any purpose, including to install the software updates at issue here; had any contacts or communications with VW America's franchise dealers in Texas; had any involvement in developing, implementing, or approving VW America's franchise dealer network in the United States, including in Texas; established channels for providing regular advice to customers residing in Texas; developed the software updates at issue here in Texas or specifically for vehicles sold or driven in Texas; or directly reimbursed Texas dealers for the costs of the recall. At most, the evidence in the record establishes that VW Germany directed recall-tampering conduct toward the United States as a whole, not to Texas specifically. But in determining whether a state court can exercise jurisdiction over a foreign defendant, only the defendant's purposeful contacts with the state, not with the United States, are relevant. *Nicastro*, 564 U.S. at 886 (rejecting non-resident contacts directed at the United States as a whole). Here, the State has failed to establish that VW Germany engaged in conduct purposefully directed at Texas.

Relatedly, the recall-tampering activities relied on by the State for purposes of specific personal jurisdiction are more properly characterized as the activities of VW America, not VW Germany: VW America sold Volkswagen-branded vehicles to its franchise dealers in the United States, including some in Texas; VW America's franchise dealers sold Volkswagen-branded vehicles to customers in the United States, including some in Texas; VW America distributed the technical description of the recalls to its technicians and customers in the United States, including some in Texas; VW America distributed the software updates to its franchise

11

dealerships nationwide, including some in Texas; VW America's franchise dealerships installed the software updates on vehicles in the United States, including some in Texas; and VW America reimbursed the dealers nationwide for the costs of the recall. But VW America's contacts or its franchise dealers' contacts with Texas are not relevant to our inquiry here. *See Michiana*, 168 S.W.3d at 785 ("[I]t is only the defendant's contacts with the forum that count."); *see also PHC-Minden*, 235 S.W.3d at 172–73 (holding that contacts of distinct legal entities, including parents and subsidiaries, are assessed separately for jurisdictional purposes unless the corporate veil is pierced).

The State argues VW Germany purposefully availed itself of Texas *indirectly* by directing its wholly owned subsidiary, VW America, to carry out recall-tampering activities on VW Germany's behalf. *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 874 (Tex. 2010) ("[P]urposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates or independent distributors)."). In support of this argument, the State relies on a 1994 "Importer Agreement" between VW Germany and VW America governing the relationship between those two entities throughout the United States as a whole. But even assuming the agreement is relevant to the recall-tampering claims at issue here, there is no evidence in the record, and the State does not suggest, that any of VW Germany's directives under the agreement were specifically directed at Texas versus being specifically directed at the United States as a whole. *See Nicastro*, 564 U.S. at 885.

The State also argues relatedly that VW Germany's recall-tampering activities were purposefully directed at Texas because, under or because of the importer agreement, VW Germany directed VW America to exhaust all United States market opportunities for Volkswagen-branded vehicles, VW Germany knew that vehicles subject to the software updates

12

had been sold and were in Texas, and VW Germany tracked the progress of the recalls. But these allegations show only that VW Germany was aware that some of the vehicles included in its nationwide recall would be located in Texas. It is well established, however, that "[m]ere knowledge that the 'brunt' of the alleged harm would be felt—or have effects—in the forum state is insufficient to confer specific jurisdiction." *Searcy*, 496 S.W.3d at 68–69 (citing *Walden v. Fiore*, 571 U.S. 277, 287 (2014)); *Michiana*, 168 S.W.3d at 788. Further, as explained above, the State has not shown that VW Germany's recall-tampering activities were specifically directed at Texas; instead, the record establishes that VW Germany's knowledge and related recall-tampering conduct were directed at the United States market as a whole. *See Nicastro*, 564 U.S. at 886 ("Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant.").

The State also argues that, even if it has not met the purposeful-availment test, jurisdiction is proper here because "a state's regulatory interest may establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *See Guardian Royal*, 815 S.W.2d at 229; *Nicastro*, 564 U.S. at 877–78 (noting possible exceptions to purposeful availment, including "intent to obstruct its laws"). However, "a state's regulatory interest alone *is not* in and of itself sufficient to provide a basis for jurisdiction." *Guardian Royal*, 815 S.W.2d at 229 (holding that exercising jurisdiction over non-resident defendant would not comport with fair play and substantial justice). Further, the supreme court's statements regarding regulatory interests in *Guardian Royal* were not made in connection with the purposeful-availment analysis, but in connection with its analysis of the "fair play and substantial justice" prong, which only comes into play after the purposeful-availment test has

13

been met.  *See id.* at 228.  Moreover, as VW Germany emphasizes, *Guardian Royal* predates later decisions by the United States Supreme Court and the Texas Supreme Court that make clear that purposeful availment requires that a defendant's contacts be purposefully directed at the forum state.  *See, e.g.*, *Nicastro*, 564 U.S. at 885; *Searcy*, 496 S.W.3d at 67; *TV Azteca*, 490 S.W.3d at 38.  We also note that the federal consent decrees require VW Germany and the other VW entities to pay several billions in monetary penalties, including $210 million to the State of Texas, $1.45 billion to Texas consumers, and more than $92 million to Texas dealers.

Finally, the State points out that another state appellate court has found personal jurisdiction over VW Germany related to its emissions tampering.  *See State by Swanson v. Volkswagen Aktiengesellschaft*, No. A18-0544, 2018 WL 6273103, at *4 (Minn. Ct. App. Dec. 3, 2018) (unpublished).  But even assuming it was decided correctly, *Swanson* is distinguishable. Most notably, in holding that VW Germany had purposefully directed activities to Minnesota, the *Swanson* court relied on allegations, which Minnesota law required the court to accept as true, that VW Germany sold and leased cars in Minnesota, marketed its vehicles to Minnesota residents, and transacted business through ten dealerships in Minnesota.  *See id.*  Relatedly, the *Swanson* court rejected VW Germany's *Nicastro* argument—i.e., that it did not specifically target Minnesota—because VW Germany did not dispute Minnesota's allegations that VW Germany had advertised and marketed its products in Minnesota and that VW Germany "*itself* installed defeat devices in used vehicles in Minnesota."  *Id.* at 5.  The evidence in the record here establishes—and the State does not allege to the contrary—that VW Germany did not sell or lease vehicles in Texas, did not market vehicles to Texas residents, did not transact business with Texas dealerships, and did not install defeat devices in Texas vehicles.  As such, *Swanson* does not inform our decision here.

14

We hold that because VW Germany's recall-tampering activities were not purposefully directed at Texas, VW Germany did not purposefully avail itself of the privilege of conducting activities within Texas. Accordingly, the trial court may not properly exercise specific jurisdiction over VW Germany.

**Audi Germany's Contacts**

The State contends that Audi Germany purposefully availed itself of the benefit of conducting activities in Texas when it:

- benefitted from the original sales of the affected vehicles in Texas, which later required further recall tampering due to failures caused by the original tampering;

- ordered VW America to install the tampering software on Audi vehicles in the United States, including in Texas, to correct the problems caused by original defeat-device software—Audi Germany knew that there were affected Audi vehicles in Texas when it ordered VW America to install the tampering software through informal and formal recall campaigns;

- electronically distributed the tampering software for installation onto Audi vehicles in the United States, including Texas—after testing the new tampering software for compatibility with Audi vehicles, Audi Germany uploaded the software to its server in Germany, that software automatically synchronized onto server in the US, and that software automatically downloaded onto the service platform used by VW America technicians in the United States, including Texas;

- approved messaging for customers and dealers about the new tampering software—Audi Germany Provided information to VW America about the software update, required VW America to draft communications based on the provided information, required VW America to obtain Audi Germany's approval for the draft communications, and directed VW America to notify Audi customers and dealers in the United States, including in Texas, about the software updates using the approved communications;

- paid to have the software installed in each vehicle—as required by its agreement with VW America, Audi Germany reimbursed VW America, which in turn reimbursed dealers, for the cost of installing the new tampering software on vehicles in the United States, including in Texas.

- benefitted from the new tampering software by avoiding mounting warranty costs for those Texas vehicles; and

15

- reimbursed VW America, which reimbursed dealers in the United States, including dealers in Texas, for the cost to install the new tampering software in each vehicle in the United States, including vehicles in Texas.

For reasons similar to those explained above, we disagree that this conduct constitutes purposeful availment.

As explained above, purposeful availment requires contacts that the defendant "purposefully directed *toward the forum state*." *Nicastro*, 564 U.S. at 886 (emphasis added); *see Searcy*, 496 S.W.3d at 67 ("Purposeful availment involves contacts that the defendant 'purposefully directed' into the forum state."); *TV Azteca*, 490 S.W.3d at 38 (same). Audi Germany's recall-tampering activities were not purposefully directed *toward Texas*: Audi Germany tested the software (created by VW Germany) in Germany; it directed VW America to notify its authorized Audi dealers and customers in the United States about the software updates using messaging approved by Audi Germany; it uploaded the software to a server in Germany, which software was transmitted to a U.S. server maintained and controlled by VW America for use nationwide; it directed VW America to install the tampering software on Audi vehicles in the United States; and it reimbursed VW America for the recall costs. The State does not allege any facts or present any evidence that Audi Germany maintained any offices, plants, or other facilities in Texas; sent any of its employees to Texas for any purpose, including to install the software updates at issue here; had any contacts or communications with VW America's franchise dealers in Texas; had any involvement in developing, implementing, or approving VW America's franchise dealer network in the United States; established channels for providing regular advice to customers residing in Texas; developed the software updates at issue in Texas or specifically for vehicles sold or driven in Texas; or directly reimbursed Texas dealers for the

16

costs of the recall. At most, the evidence in the record establishes that Audi Germany directed its recall-tampering conduct toward the United States as a whole, not to Texas specifically. But in determining whether a state court can exercise jurisdiction over a foreign defendant, only the defendant's purposeful contacts with the state, not with the United States, are relevant. *Nicastro*, 564 U.S. at 886 (rejecting non-resident contacts directed at the United States, versus at New Jersey, as a whole). Here, the State has failed to establish that Audi Germany engaged in conduct purposefully directed at Texas.

Relatedly, the recall-tampering activities relied on by the State for purposes of specific personal jurisdiction are more properly characterized as the activities of VW America, not Audi Germany: VW America distributed the technical description of the recalls to its technicians and customers in the United States, including some in Texas; VW America distributed the software updates to its Audi franchise dealerships nationwide, including some in Texas; VW America's Audi franchise dealerships installed the software updates on vehicles in the United States, including some in Texas; and VW America reimbursed the dealers nationwide for the costs of the recall. But VW America's contacts or its franchise dealers' contacts with Texas are not relevant to whether Audi Germany purposefully availed itself of the privilege of conducting activities in Texas. *See Michiana*, 168 S.W.3d at 785 ("[I]t is only the defendant's contacts with the forum that count."); *see also PHC-Minden*, 235 S.W.3d at 172–73 (holding that contacts of distinct legal entities, including parents and subsidiaries, are assessed separately for jurisdictional purposes unless the corporate veil is pierced).

The State argues that the original-tampering conduct—i.e., the factory installation of the defeat-device software—has relevance to our purposeful-availment inquiry here because the original- and recall-tampering scheme are inextricably linked given that the need for the

17

recall tampering would not exist but for the original tampering. But a non-resident defendant can only be subject to specific personal jurisdiction if its "*suit-related conduct* . . . create[s] a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis added). In this case, because the trial court has rendered summary judgment that the original-tampering claims are preempted by federal law, only recall-tampering conduct can be said to be "suit-related conduct."

The State argues Audi Germany purposefully availed itself of Texas *indirectly* by directing VW America to carry out recall-tampering activities on Audi Germany's behalf. *See Spir Star*, 310 S.W.3d at 874 ("[P]urposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates or independent distributors.)"). In support of this argument, the State relies on a "Importer Agreement" between Audi Germany and VW America governing the relationship between those two entities throughout the United States as a whole. For example, the State emphasizes that, under the agreement, Audi Germany planned to have a role in sales-network planning and dealership agreements and that Audi Germany intended to maintain a high degree of control over any recall process. But even assuming that the agreement is relevant to the recall-tampering claims at issue here and, importantly, assuming that Audi Germany actually engaged in the conduct described in the agreement, Audi Germany's conduct under the agreement was directed at the United States as a whole, not at Texas. *See Nicastro*, 564 U.S. at 885.

The State also argues relatedly that Audi Germany's recall-tampering activities were purposefully directed at Texas because, under the importer agreement, Audi Germany directed VW America to exhaust all United States market opportunities for Audi-branded vehicles, Audi Germany knew that vehicles subject to the software updates had been sold and

18

were located in Texas, and Audi Germany tracked the progress of the recalls. But these allegations show only that Audi Germany was aware that some of the vehicles included in its nationwide recall would be in Texas. It is well established, however, that "[m]ere knowledge that the 'brunt' of the alleged harm would be felt—or have effects—in the forum state is insufficient to confer specific jurisdiction." *Searcy*, 496 S.W.3d at 68–69 (citing *Walden v. Fiore*, 571 U.S. 277, 287 (2014)); *Michiana*, 168 S.W.3d at 788. Further, as explained above, the State has not shown that Audi Germany's recall-tampering activities were specifically directed at Texas; instead, the record establishes that Audi Germany's knowledge and related recall-tampering conduct were directed at the United States market as a whole. *See Nicastro*, 564 U.S. at 886 ("Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant.").

The State also argues that, even if it has not met the purposeful-availment test, jurisdiction is proper here because "a state's regulatory interest may establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Guardian Royal*, 815 S.W.2d at 229; *see Nicastro*, 564 U.S. at 877–78 (noting possible exceptions to purposeful availment, including "intent to obstruct its laws"). However, "a state's regulatory interest alone *is not* in and of itself sufficient to provide a basis for jurisdiction." *Guardian Royal*, 815 S.W.2d at 229 (holding that exercising jurisdiction over non-resident defendant would not comport with fair play and substantial justice). Further, the supreme court's statements regarding regulatory interests in *Guardian Royal* were not made in connection with the purposeful-availment analysis but in connection with its analysis of the "fair play and substantial justice" prong, which only comes into play after the purposeful-availment test has

19

been met. *See id.* at 228. We also note that the federal consent decrees require the various VW entities to pay several billions in monetary penalties, including $210 million to the State of Texas, $1.45 billion to Texas consumers, and more than $92 million to Texas dealers, and that VW America, Audi America, and Porsche America remain as defendants in this action.

We hold that because Audi Germany's recall-tampering activities were not purposefully directed at Texas, Audi Germany did not purposefully avail itself of the privilege of conducting activities within Texas. Accordingly, the trial court may not properly exercise specific jurisdiction over Audi Germany.

**Conclusion**

Because VW Germany's and Audi Germany's recall-tampering activities were not purposefully directed at Texas, we hold that VW Germany's and Audi Germany's contacts with the State of Texas are insufficient to confer specific jurisdiction over these entities as to the State's Texas Clean Air Act recall-tampering claims. Therefore, the trial court erred in denying VW Germany's and Audi Germany's special appearances. We reverse the trial court's orders denying the special appearances and render judgment dismissing the State's claims against VW Germany and Audi Germany.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Smith
  Dissenting Opinion by Justice Triana

Reversed and Rendered

Filed:  December 22, 2020